57 CCPA

**Application of Donald RICHMAN.**
**Patent Appeal No. 8281.**

United States Court of Customs
and Patent Appeals.
May 7, 1970.

Laurence B. Dodds, Great Neck, N. Y., attorney of record, for appellant; Jesse C. Bowyer, Washington, D. C., of counsel.

Joseph Schimmel, Washington, D. C., for the Commissioner of Patents; Jere W. Sears, Washington, D. C., of counsel.

Before RICH, Acting Chief Judge, ALMOND, BALDWIN, and LANE, Judges and FORD, Judge, United States Customs Court, sitting by designation.

RICH, Acting Chief Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the rejection of claims 1–3, 11, and 12 of appellant's reissue application serial No. 299,141, filed July 26, 1963,[1] for reissue of his patent No. 2,933,558, granted April 19, 1960, on an application filed December 23, 1957,[2] for "Noise-Immune Synchronizing-Signal Separator for Television Receivers."

Three issues are raised. One is whether the appealed application is defective for lack of a reissue oath complying with the requirements of 35 U.S.C. § 251. A second issue pertains to the rejection of claims 11 and 12 "as involving new matter." The third issue is whether claims 1–3, 11, and 12 are unpatentable over the prior art.

## The Invention

The invention relates to a circuit for deriving synchronizing pulses from the composite signal received by a television receiver without the introduction of false pulses resulting from random electrical noise which may be present in the signal.

As background, the television video (picture) signal is produced in a television camera tube which employs an electron scanning-beam to read off variations of voltage amplitude corresponding to the portions of a picture image focused on a photo-sensitive surface. The image is reproduced in a receiver picture tube by causing another electron beam which is modulated and deflected in synchronism with the beam in the camera tube to impinge on a photophosphorescent surface.

The scanning is accomplished by moving the beam repeatedly in parallel lines extending from what we will term left to right across the scanned surface with the first line at the top of the surface and each succeeding line vertically displaced below the preceding line until a "field" covering the vertical extent of the surface has been traversed. The beam is returned to the left at an increased speed following completion of each line to begin the next line and is returned to the top at a similarly increased speed at the end of each field to position it for the start of the succeeding field.

The transmitted video signal includes the modulated picture signals representing light variations in the successive lines, blanking pulses between the modulated signals for blanking out the beam between succeeding lines, and line and field synchronizing pulses for establishing the time for starting each line and each field, respectively. In standard United States practice, the picture signal is negatively modulated, which means that decreases in its amplitude correspond to increases in light or whiteness of the image, the blanking pulses are at a greater amplitude corresponding to black in the picture, and the synchronizing pulses are superimposed on the blanking pulses to extend further into the black region.

In the receiver, a composite video signal having the above described components is derived from a modulated carrier signal received at the antenna. The derived signal is so imposed on the beam-modulated components of the picture tube that the beam increases in intensity with decreases in the modulated signal and is blanked out during the blanking pulses and the synchronizing pulses. In order to coordinate the scanning of the lines and fields by the electron beam of the receiver tube with the camera beam, the receiver is provided with a line-scanning generator and a field-scanning generator which are held in proper synchronism by application thereto of the line-scanning pulses and field-scanning pulses respectively. The present invention deals with the separation of the synchronizing pulses from the composite signal. That separation is attained in conjunction with production of an AGC (automatic gain control) signal for ap-

---

1. Designated a continuation of reissue application serial No. 56,073 filed September 14, 1960.

2. Designated a division of serial No. 175,-192 filed July 21, 1950.

plication to early stages of the receiver, including the radio-frequency and inter-mediate-frequency amplifiers, to adjust their gain or amplification and thus automatically maintain the strength of the composite video signal substantially uniform despite variations in the strength of the received signal due to fading and the like.

In appellant's receiver, the composite video signal is applied to the grid of an AGC rectifier tube of triode form. That tube is connected so as to develop in its anode circuit a negative bias voltage which is proportional to the strength of the applied signal and that bias voltage is applied to control the gain of the circuits in the receiver ahead of the output of the composite video signal itself. The AGC tube also develops in its cathode circuit a bias voltage of the same general character as the anode voltage but of opposite, or positive, polarity. That voltage varies in strength proportionally to the strength of the synchronizing signals and, consequently, to the strength of the signal picked up by the receiver antenna.

Concurrently, the composite video signal, with the synchronizing signals of positive polarity, is applied to the control grid of a synchronizing-signal separator tube through a high value resistor so that positive values of that signal tend to make this tube conductive. However, the aforementioned positive bias developed in the AGC tube circuit is applied to the cathode of the synchronizing-signal separator tube through a resistor network in the circuit of that cathode and the effect of that bias is to tend to make the separator tube nonconductive. The result is that the latter tube becomes conductive only during the peaks of the synchronizing signal. When the tube becomes conductive, it develops a synchronizing pulse in its output circuit and the pulses so developed are applied through a suitable circuit for application to the scanning generators.

Since the bias developed across the network in the cathode of the AGC tube is derived from the synchronizing signal, and varies dynamically with its magnitude, that bias and the synchronizing signal rise and fall together. Consequently, the separator tube conducts only on the peaks of the synchronizing signal whether it is weak or strong.

Up to this point, we have not considered the fact that the received composite video signal is frequently accompanied by strong electrical disturbances termed "noise," which often are of a form similar to, but stronger than, the synchronizing pulses themselves. These noise pulses occur at random times and, if mistaken for synchronizing pulses by the synchronizing circuits of the receiver, would cause the receiver to drop out of synchronism and possibly distort the image on the picture tube beyond recognition.

Appellant's receiver is provided with a circuit for eliminating that effect of noise signals. The circuit includes a diode connected between the input circuit to the grid of the synchronizing-signal separator tube and the cathode of that tube. It is biased against conduction by the bias potential produced across the resistor network in the cathode circuit of the separator tube. However, the characteristics and connection of the triode in the circuit are such that a stronger signal is required to make the diode conductive than is required to make the synchronizing signal separator tube conductive. That is, the diode becomes conductive only when the composite signal impressed on the grid circuit of the separator tube includes signals, such as noise, which are greater in amplitude than the synchronizing pulses. Since the diode is connected at one terminal to the cathode of the separator tube and thus is subjected like that tube to a bias potential which rises and falls with variations in the strength of the received signal as measured by the amplitude of the synchronizing signal, the threshold or signal level at which the diode becomes conductive likewise varies dynamically with the strength of the received signal while remaining above the amplitude of the synchronizing signals.

When a noise signal of high amplitude occurs in the composite video signal, the diode becomes conductive and passes a current through the resistors in the cathode circuit of the synchronizing-signal separator tube. That current increases the positive bias of the cathode of that tube, making it nonconductive so that the noise pulse applied to its grid circuit is not reproduced in its output circuit and is not impressed on the scanning generators. Thus, only the synchronizing pulses are passed by the separator tube and applied to the appropriate circuits to maintain the output of the scanning signal generators to the picture tube in step with the deflections of the scanning beam in the transmitter.

Claim 1 (duplicate of patent claim 1) and claim 11 (new in the reissue application) are representative and read as follows (paragraphing ours):

1. A highly noise-immune synchronizing-signal separator system for a television receiver comprising:

first means for supplying a negatively modulated television signal including picture-signal components and synchronizing pulses which tend to be accompanied by unwanted noise signals greater in amplitude than the synchronizing pulses;

second means coupled to said first means for developing a potential representative of and which varies dynamically with the amplitude of said synchronizing pulses;

synchronizing-signal separating means responsive to said first means and dynamically responsive to said potential for separating said synchronizing pulses above the maximum level of said picture-signal components regardless of variations in the amplitude of said synchronizing pulses; and

means coupled to said first and second means for rendering said separating means inoperative in response to the occurrence of said noise signals.

11. A highly noise-immune synchronizing-signal separator system for television receivers of a variable amplitude negatively modulated signal including picture components and synchronizing pulses at amplitude levels above the level of the picture components and in which the synchronizing pulses tend to be accompanied by undesirable noise components greater in amplitude than the synchronizing pulses comprising:

synchronizing pulse separating means responsive to the amplitude of said signal for separating the synchronizing pulses above the level of the picture components regardless of the amplitude variations of said signal, thereby eliminating from the output of said separating means picture components and noise components below that level; and

means responsive to the amplitude of said signal for rendering said separating means inoperative in response to the occurrence of noise components greater in amplitude than the synchronizing pulses regardless of the amplitude of variations of said signal, thereby eliminating the latter noise components from the output of said separating means.

### The Reissue Oath

The reissue oaths of both the first reissue application and the present continuation application assert that the patent is inoperative in part by reason of the applicant having claimed less than he had a right to claim through the failure to present claims of the scope of the new claims being sought. They also assert that the inoperativeness arose through error and without deceptive intention and that the defects in the patent arose because of the failure of the attorney to comprehend the advantages and scope of the invention. The present continuation application was accompanied by an affidavit of Edward Ruestow, the principal attorney, asserting that a copy of the patent was submitted to Bernard D. Loughlin, a consultant for Hazeltine Research, Inc. (assignee of the patent), to obtain his opinion on the

probable use of the invention. That was done about August of 1960 under an established practice of requesting Mr. Loughlin to review selected patents within two years after their issue dates. Mr. Loughlin advised that he considered the patent claims to be needlessly limited and the reissue application including broadened claims was then prepared. Additional affidavits by others associated with the assignee, which gave more specific information, were subsequently submitted in response to objections by the examiner.

The board regarded the examiner's position on this issue to be that the claims were rejected "as being based on a defective [reissue] oath." It sustained the rejection, stating:

> The concept of a device which appellant did not invent, or disclose; and which was called to his attention by a third party after the issuance of his patent is not an error within the meaning of 35 U.S.C. 251.[3] Therefore, the oath is ineffective and, in the absence of an effective oath, this reissue application is fatally defective.

We reverse that rejection. The assertions in the reissue oaths pointed out above are clearly sufficient under the reissue statute. The statute imposes no restriction on the manner in which the defect in the patent is discovered. The circumstance that the asserted defect was discovered by a person other than the patentee under a practice of having such person review selected patents does not negate the assertion in the oath that the patent is inoperative in part nor does it indicate that the defect did not arise "through error without any deceptive intention."

On first impression, the board's reference to "a device which appellant did not invent, or disclose" might appear to imply that the claims were considered not to be supported by the disclosure. However, we think it clear that this rejection does not raise that question. First, the question would pertain not to the reissue oath but to the adequacy of the disclosure under 35 U.S.C. § 112, a matter the board does not discuss in this connection. Also, the rejection is applied to claims 1–3, which duplicate original patent claims, as well as new claims 11 and 12 and there is no indication that the examiner or board considered the former claims to be unsupported by the patent specification.

### New Matter

■ The board stated that claims 11 and 12 stand rejected "as involving new matter." In support of this rejection, it pointed to various amendments made to the specification of appellant's original (parent) application serial No. 175,-192, filed on July 21, 1950.[4] It sustained the rejection because "appellant has not explained why * * * [those amendments] do not involve new matter * * *."

We presume the reference to "new matter" in the rejection has reference either to the proscription in 35 U.S.C. § 251[5] or in 35 U.S.C. § 132. Under either section, it is apparent that there is no "new matter" in the present case. The solicitor appears to concede as much. The patent here issued on application serial No. 704,663, filed December 23,

---

3. § 251. *Reissue of defective patents*
   Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue.

4. See note 2.

5. See note 3.

1957, designated a division of serial No. 175,192, and, as conceded by the solicitor, all of the amendments designated by the board were made in the latter application before serial No. 704,663 was filed and were included in that application as filed. No issue as to the availability of prior art intervening between the two filing dates is involved, and the present reissue application has the same disclosure as that in the patent.

The rejection of claims 11 and 12 as "involving new matter" is therefore reversed.

### The Prior Art

The references involved in the prior art rejection are:

| | | |
|---|---|---|
| Lamb | 2,101,549 | Dec. 7, 1937 |
| Martinelli | 2,299,333 | Oct. 20, 1942 |
| Applegarth | 2,356,140 | Aug. 22, 1944 |
| Holland et al. | 2,434,929 | Jan. 27, 1948 |
| Marconi (Australian) | 145,870 | Mar. 25, 1952 |

"Television" by Zworykin and Morton, John Wiley, 1940 (pages 464–465)

Martinelli relates to a system for reducing the effect on the scanning circuits of a television receiver of noise signals present in a composite video signal having negative picture signal modulation. The composite signal is applied to a synchronizing-signal amplifier which feeds the synchronizing-signal separator. This composite signal is concurrently applied to the input circuit of a noise inverter tube. That tube provides amplified noise-pulses in inverted form at its output, which pulses are applied to the suppressor grid of the amplifier tube to block it for the duration of the noise pulses and prevent transmission of those pulses to the synchronizing-signal separator. The inverter tube is disclosed as having a bias means manually adjustable to selected values. The specific circuit of the separator tube, and hence its biasing means, are not disclosed.

The Lamb patent relates to a radio receiver provided with means to silence undesired noise impulses which exceed in strength the voltages induced by desired signals. The input signal from the antenna is fed through an amplifier to the detector and thence to the audio frequency amplifier and loud speaker. The signal is also applied to a silencer tube which becomes conductive in response to the presence in the input of an undesired pulse exceeding a selected value. The silencer tube then produces a control voltage which is applied to the tube of the amplifier to either disable that tube or reduce its amplification for the duration of the undesired pulse. In one form, the silencer tube is provided with a negative bias which determines the amplitude of noise to which it responds by a manually adjusted biasing means. In a modification, the negative bias is provided through an AVC (automatic volume control) circuit so that the conductive level or threshold of the tube varies dynamically with the volume of the signals received.

"Television" describes several types of synchronizing signal separator circuits for television receivers. In one circuit, the grid of the separator tube is self-biased to cut-off by rectification of the applied signal in the grid circuit, which circuit includes a time-constant circuit consisting of a series condenser and a shunt resistor. The reference states:

&ast; &ast; &ast; the grid tends to maintain itself at such a d–c potential that zero bias corresponds to the maximum posi-

tive peaks of the signal, or in this case, the top of the synchronizing impulses. If the amplitude of the impulses is sufficient so that black corresponds to plate current cutoff, only the synchronizing impulses are amplified, the rest of the signal occurring beyond cutoff.

Applegarth relates to a television receiver having a combined AGC and synchronizing signal separator circuit. The AGC circuit comprises a triode fed with the composite intermediate frequency signal to develop the AGC voltage at its anode. That tube also has a time-constant circuit in its cathode circuit which develops a bias varying with signal strength. The intermediate frequency signal is also fed to the separator tube which has its grid biased with a portion of the varying bias voltage in the cathode circuit of the AGC tube to clip the synchronizing pulses at a selected level above the picture signal despite variations in strength of the input signal. The output signals from the separator are fed to the scanning or deflecting generator through a diode so biased as to clip or limit the amplitude of any high amplitude noise pulses passed by the separator to a value substantially equal to that of the synchronizing pulses.

In the view we take of the case, specific consideration of the Holland and Australian Marconi patent becomes unnecessary.

The examiner rejected the claims as unpatentable over Martinelli taken with Lamb, further referring to the "Television" publication, and was sustained in that position by the board. Such rejection, characterized by the solicitor in oral argument as the best prior art rejection, is plainly based on obviousness under 35 U.S.C. § 103.

The examiner recognized that Martinelli's noise-cancelling circuit operating on the synchronizing-signal amplifier has a fixed threshold. However, the rationale of the rejection is that the showing in Lamb of the alternative use of an automatic volume or gain control signal to provide a dynamic bias, in place of a fixed bias, in a noise-cancelling circuit in a radio receiver would suggest to one skilled in the art the substitution in Martinelli's noise-suppressor circuit of means for providing a dynamic bias varying with the synchronizing signal strength. The rejection is further based on the proposition that it would also be obvious to use a self-biasing synchronization-signal separator as shown in "Television" as the separator in Martinelli.

Turning to the merits of this rejection, it is true that Martinelli does not specifically show or describe an automatic gain control circuit to provide signals in the receiver which are automatically compensated for variations in the strength of the received signal. However, Martinelli does discuss the alternatives of providing the tubes in the early stages of the receiver with filter circuits which have either a very short or a very long time constant and states, with respect to the use of the latter alternative:

> This, however, cannot be done where an automatic volume control voltage is being applied to the tube.

That statement plainly suggests that, when filter circuits of suitable time constants are employed, automatic volume or gain control (AGC) could be employed in Martinelli. Moreover, the record provides no basis for doubting that a person having ordinary skill in the art would have been able to provide such a control in carrying out that suggestion.

■ Lamb's teaching of the substitution of means automatically regulating the threshold silencing point of a noise-cancelling circuit by using a bias varying dynamically with the automatic volume or gain control voltage as an alternative to providing a non-dynamic, but manually adjustable, bias suggests that the noise-suppressor circuit in Martinelli might also be automatically biased. While appellant urges that substitution of the Lamb circuit in Martinelli would result in an inoperative device, that is not

material here. The question in a rejection for obviousness on a combination of references is what the secondary reference would teach one skilled in the art and not whether its structure could be bodily substituted in the basic reference structure. In re Soderquist, 326 F.2d 1016, 51 CCPA 969 (1964). What Lamb teaches is the concept of automatically varying the bias of a noise-suppressor tube in accordance with variations in strength of the applied signals instead of using a bias which is manually adjusted in accordance with what the strength of the signals is expected to be. We think the utility of incorporating such an automatic or dynamic bias in Martinelli would have been apparent to a person having ordinary skill in the electronic communications are, and we find nothing in the record that gives rise to any doubt that it would have been within the ability of such a person to follow through to produce an operative circuit incorporating that concept.

As to the synchronizing-signal separator, Martinelli suggests use of a circuit "of any well-known type." This clearly suggests employing separator circuits that became known subsequent to his application as well as those already known. Certainly that suggestion applies to circuits in "Television," which is a textbook published only shortly after Martinelli's application was filed. For that reason, and in light of the reference in "Television" to its self-biased separator as "[a] more satisfactory limiter [separator]" than a fixed-bias separator previously described therein, we are satisfied that it would have been obvious to employ the "Television" self-biased separator in Martinelli.

■ We think that the Martinelli circuit so modified in an obvious manner in accordance with the Lamb and "Television" references demonstrates that

claims 3, 11, and 12 are unpatentable. None of these claims requires that the synchronizing-signal separator be connected to the same dynamically-varying bias voltage as the noise-suppressor[6] and appellant has not pointed out any limitation by which they distinguish from such modified circuit.

■ Claims 1 and 2 present an additional issue, however. Thus, they require that the synchronizing-signal separating means be dynamically responsive to "a potential" which is developed in the "second means" and is "representative of" and "varies dynamically with" the amplitude of the synchronizing pulses. That "second means" is coupled to the "means * * * for rendering * * * [the] separating means inoperative in response to the occurrence of * * * noise signals" (the noise suppressor). Martinelli as modified in accordance with Lamb and "Television" would not comply with those requirements. Rather, the separator would then be biased from its own input circuit and thus not be dynamically responsive to the "potential" provided by the second means, which means is coupled to the noise suppressor.

Moreover, we find nothing in the record to demonstrate that it would be obvious to make such further changes in Martinelli as would be necessary to meet claim 1. In particular, we do not see that Applegarth, which we next discuss in some detail, would have suggested any modification of Martinelli's noise-cancelling circuit that would result in the noise suppressor and signal separator being supplied from the same dynamic-bias source. We accordingly will not sustain the rejection of claims 1 and 2 on grounds involving Martinelli as the basic reference.

The board also held the claims unpatentable over Applegarth, possibly as anticipated thereby (35 U.S.C. § 102)

6. Claim 3 recites "a synchronizing-signal stripper responsive to at least some of * * * [the] components of * * * [the composite] video frequency signal

and undesirably responsive to * * * [the] noise pulses * * *," but does not specify how it is biased.

but certainly as obvious in view of it and other references including Martinelli (35 U.S.C. § 103). In so relying on Applegarth, the board was in effect reviving a rejection on that patent which the examiner originally made but withdrew in his Answer. We conclude that the rejection based on Applegarth must be reversed.

The Applegarth television receiver derives an AGC voltage from the output of the intermediate frequency amplifier circuit and applies it to control the gain of that circuit. It also imposes a portion of a signal varying with the AGC voltage at suitable polarity to a synchronizing-signal separator tube. The output of the latter tube is connected to the utilization circuit for the synchronizing signals through a diode biased to clip the tops off noise signals passed by the separator that exceed the amplitude of the synchronizing signals. Since Applegarth merely clips the noise signals from the separator, it does not anticipate the claims, which require that the separator be disabled or rendered inoperative.

The only secondary reference which requires discussion in connection with the rejection involving Applegarth as a basic reference is Martinelli. The board regarded the latter as demonstrating that it would be obvious to connect a diode or triode across the separator tube of Applegarth "to render it inoperative in the presence of noise." However, it is not apparent that one skilled in the art would have found it obvious to add a circuit to suppress noise to a receiver already equipped to reduce the effect of noise by clipping the noise pulses. Even if Martinelli were held to suggest substitution of its noise-cancelling circuit in Applegarth, we do not see that it would have been obvious to employ that circuit in any manner which resulted in its being supplied with a dynamic bias from the Applegarth separator tube circuit. Accordingly, the rejection grounded on Applegarth as a basic reference is reversed.

*Summary*

The rejection of claims 1–3, 11, and 12 on the grounds that the reissue oath is defective is reversed as is the rejection of claims 11 and 12 on the basis of "new matter." The rejection on prior art is reversed as to claims 1 and 2 and affirmed as to claims 3, 11 and 12.

The decision is affirmed as to claims 3, 11, and 12 and is reversed as to claims 1 and 2.

Modified.