**HAZELTINE RESEARCH, INC.,**
**Plaintiff,**

v.

**FIRESTONE TIRE & RUBBER COM-**
**PANY, Defendant.**

**Civ. A. No. 1178(C).**

United States District Court,
W. D. Virginia,
Charlottesville Division.

Oct. 4, 1971.

Leonard G. Muse, Woods, Rogers, Muse, Walker & Thornton, Roanoke, Va., Laurence B. Dodds, Great Neck, N. Y., for plaintiff.

E. Griffith Dodson, Jr., Dodson, Pence & Coulter, Roanoke, Va., Thomas M. Ferrill, Jr., Allen V. Hazeltine, Blue Bell, Pa., for defendant.

James H. Michael, Jr., Charlottesville, Va., Special Master.

## OPINION

WIDENER, District Judge.

This quite technical patent case concerns a circuit used in Philco television receivers sold by Firestone.

The court is quite aware that this opinion concerns itself principally with matters of fact and considers this is the proper approach to the questions presented.

A television picture tube is a cathode ray tube in which the electron beam impinges on a photo phosphorescent surface at the large end of the tube, which creates the image that the viewer sees while watching television.

The electron beam moves back and forth in a horizontal direction in excess of 15,000 times per second and moves up and down the tube in a vertical direction at a considerably lesser rate. Each succeeding horizontal pass of the electron beam is displaced vertically just below the one above it. When the beam has completed its bottom pass across the tube, it starts again at the top. Light and dark colors as viewed on the large end of the tube are created by the intensity of the beam of electrons within the tube which instantaneously varies in accordance with the image in front of the television camera. A television picture, therefore, as seen by the viewer, is not unlike an impressionist painting or the more familiar pictures in a newspaper, which latter are made up of many tiny dots of different shades of color.

In order to faithfully reproduce the object in front of the television camera, it is necessary for the electron beam in the cathode ray tube, in its travels back and forth and up and down across the tube, to be synchronized with the television camera and the electron beam in the cathode ray tube in the camera, so that the beam in the camera and the beam in the receiver are always at the same place in their respective cathode ray tubes at the same time.

In order to achieve this, synchronizing pulses of electrical energy are transmitted along with the picture content and sound content as a part of the signal of the television broadcasting station. These synchronizing pulses, each time they occur, cause the electron beam in the picture tube of the receiver to automatically align itself with the electron beam in the cathode ray tube of the camera.

Unfortunately, the television receiver, in addition to receiving the signal from the broadcasting station, also receives unwanted electrical impulses, which may hereafter be referred to as noise, and which are not a part of the signal from the television station. Anyone who has listened to the radio, particularly old-time radio, is familiar with static, which is the effect of similar unwanted electrical impulses in radio. Frequently, these unwanted electrical impulses are of greater magnitude than the amplitude of the synchronizing pulses so that synchronizing pulses are submerged in the unwanted pulses, and the electron beam in the receiver picture tube either does

not synchronize, or tries to synchronize with the unwanted electrical impulses. In either event, the viewer cannot see on the picture tube the object which is in front of the television camera because the electron beam in the picture tube is not synchronized with that in the camera.

The invention, Richman Patent No. 2,933,558, is designed to eliminate the effects of the unwanted electrical impulses, or noise, on the synchronizing signals.

The only assertion before the court at this time is that the Philco circuit infringes Claim 1 of Richman Patent No. 2,933,558.

The defenses are that the claim of Richman 558 was anticipated under 35 U.S.C. § 102(a) and (b) by Tolson Patent No. 2,232,084; that the Richman claim is invalid for obviousness under 35 U.S.C. § 102, in view of Lamb Patent No. 2,101,549, Farrington Patent No. 2,152,470, Martinelli Patent No. 2,299,-333, Applegarth Patent No. 2,356,140; and the said Tolson 084; that the Richman 558 claim cannot be asserted against the Philco circuit because Philco, with the knowledge of the plaintiff, had been making and selling the same or an equivalent circuit three years before plaintiff asserted any claim commensurate with that involved here; that the Richman claim is invalid under 35 U.S.C. § 112 because of indefiniteness; that Claim 3 of Richman 558, which plaintiff concedes is invalid, is no different from Claim 1; and that the accused circuit does not infringe the claim of Richman 558. Firestone also takes the position that Richman 558 is not entitled to its original filing date of July 21, 1950, and that it is entitled to attorneys' fees.

The filing date should be disposed of first. The original Richman application Serial No. 175,192, filed July 21, 1950, included circuit diagrams and descriptions of two variants of noise-immune sync separator circuits. In an office action dated July 23, 1953, a Patent Office Examiner held that the application contained two species of Richman's invention and required Richman to restrict the claims of that application to a single species. The applicant elected to prosecute in that application the species of the invention not under consideration in this case.

That original Richman application Serial No. 175,192 was abandoned on January 27, 1958 for failure to prosecute it further, but prior to its abandonment, on December 23, 1957 divisional application Serial No. 704,663 was filed. The divisional application pertained to the second species of the invention, which had not been earlier further prosecuted. The divisional application Serial No. 704,663 was granted on April 19, 1960 and was designated as Patent No. 2,993,-558.

Examination of 35 U.S.C. §§ 120, 121 demonstrates that the 558 patent is entitled to the filing date of July 21, 1950, the date on which the original Richman application Serial No. 175,192 was filed. 35 U.S.C. § 121 states:

"If two or more independent and distinct inventions are claimed in one application, the Commissioner may require the application to be restricted to one of the inventions. If the other invention is made the subject of a divisional application which complies with the requirements of Section 120 of this title it shall be entitled to the benefit of the filing date of the original application. * * * *"

35 U.S.C. § 120 states:

"An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it con-

tains or is amended to contain a specific reference to the earlier filed application."

The Patent Office recognized the compliance of Richman's Application for the 558 patent with § 120, for it designated that application of December 23, 1957 as "Divided" from the original application Serial No. 175,192.

Firestone's contention that the 558 patent is not entitled to the 1950 filing date is premised upon the allegation that the 558 patent contains new matter. To support this contention, defendant cites the court to decisions by the Patent Office and the Patent Office Board of Appeals concerning the reissue of patent 558. Those decisions, however, at no point, hold that new matter pertaining to Claim 1 of the 558 patent, the claim in issue in this case, was added to the application for that patent. Neither did the Court of Customs and Patent Appeals, in reviewing the decision of the Board of Patents, hold that Claim 1 of 558 patent contained new matter. In re Richman, 424 F.2d 1388 (C.C.P.A. 1970). Of course, the Patent Office's designation of the application for the 558 patent, as a division of application Serial No. 175,195 also refutes defendant's contention. The addition of new matter to a pending application is explicitly proscribed by 35 U.S.C. § 132 and Rule 118 of the Patent Office.

■ It should be further noted that plaintiff has filed at least two applications for the reissue of patent 558. The filing of those reissue applications is of little relevance since plaintiff is here relying on Claim 1 of the Richman 558 patent which patent remains in full force and effect until a reissue patent is actually granted and the original patent surrendered to the Patent Office. 35 U.S.C. § 251. Furthermore, the granting of the reissue application

" * * * shall not affect any action then pending nor abate any cause of action then existing, and the reissued patent, to the extent that its claims are identical with the original patent, shall

constitute a continuation thereof and have effect continuously from the date of the original patent." 35 U.S.C. § 252.

In May 1970, the Court of Customs and Patent Appeals held that the reissue application should be granted insofar as Claim 1 is concerned. It is further noted that Claim 1 of the reissue application is the same as Claim 1 of the 558 patent. In re Richman, 424 F.2d 1388, 1389, 1391, 1392 (C.C.P.A.1970).

It is the opinion of the court that Richman 558 is entitled to the filing date of July 21, 1950.

A comparative analysis of the circuits involved will be helpful, and the court refers to Exhibit P–29, a copy of which is appended to this opinion. The parties admitted in argument before the court that the wiring diagrams of Richman 558 and the accused circuit are faithfully represented in Exhibit P–29. To Exhibit 29 as reproduced here the court has added the symbol 32 bias network from the circuit diagram which is a part of Richman 558.

The composite video signal shown coming out of the video frequency amplifier is acknowledged to be the same in both Richman 558 and the accused circuit. At that point, the composite video signal, for our purposes, may be said to contain the synchronizing signal pulses and the picture content with, from time to time, the unwanted electrical impulses. In the 558 circuit, the composite signal is applied to the grid of triode tube 30 and the grid of triode tube 50. Triode tube 30 is an automatic gain control tube which receives an electrical impulse to its anode across condenser 39. This control signal applied to the anode is comprised of " * * * periodic positive polarity gating pulses supplied by the line scanning amplifier 23." Ex. P–27, col. 7. See also circuit diagram in Ex. P–27 which is appended to this opinion. "These periodic pulses * * * constitute the sole anode energizing potential for the tube 30." P–27, column 7. When these pulses, which are in synchronous relation with and, in par-

ticular, coincident with the synchronizing pulses, momentarily render tube 30 conductive, there is developed across the network 32, shown in Ex. P–27, or a portion of such network, a unidirectional control potential of positive polarity dynamically related to the peak amplitude of the synchronizing components of the signal. This developed potential is proportional to the amplitude of the sync components. Ex. P–27, column 7. This developed potential then is applied to the cathode of triode 50 (the sync signal separator tube), and also to the cathode of diode 90, which is biased so that it normally does not conduct. When an unwanted electrical impulse enters the television set as a part of the composite video signal, is applied to the anode of diode 90, and its amplitude is greater than the bias at the cathode of diode 90, the tube diode 90 then does conduct, and the signal passed by diode 90 to the cathode of triode 50 renders triode 50 momentarily inoperative. The unwanted electrical impulses thus do not pass out of triode 50.

In the accused circuit, the composite video signal goes to the grid of triode 1/2S8, which is the sync signal separator tube performing the same function as triode 50 in Richman 558. The bias for triode 1/2S8 is a grid leak self bias circuit consisting of compositors .01 and 220K and resistors 220K and 1.2 meg as set out in plaintiff's argument. The plaintiff admits there is nothing new about a grid leak self bias. The grid leak self bias thus applied to the grid of 1/2S8 is also applied to the grid of triode 1/2S7, which is normally biased to remain non-conductive. When unwanted electrical signals come into the circuit as a part of the composite video signal, they also are applied to the grid of triode 1/2S7, and when the amplitude of the unwanted signals exceeds the bias, tube 1/2S7 becomes conductive and from its anode an electrical signal is transmitted to the grid of triode 1/2S8. This signal renders triode 1/2S8 momentarily inoperative and prevents the passing of the unwanted electrical impulses out of triode 1/2S8 by way of its anode.

With the above simplified operation of the circuits in mind, the attention of the court is properly diverted at this point to the claim:

*Claim 1 of Richman Patent No. 2,933,558*

Preamble: A highly noise-immune synchronizing-signal separator system for a television receiver comprising:

[A]  First means for supplying a negatively modulated television signal including picture-signal components and synchronizing pulses which tend to be accompanied by unwanted noise signals greater in amplitude than the synchronizing pulses;

[B]  second means coupled to said first means for developing a potential representative of and which varies dynamically with the amplitude of said synchronizing pulses;

[C]  synchronizing-signal separating means responsive to said first means and dynamically responsive to said potential for separating said synchronizing pulses above the maximum level of said picture-signal components regardless of variations in the amplitude of said synchronizing pulses;

[D]  and means coupled to said first and second means for rendering said separating means inoperative in response to the occurrence of said noise signals.

What Claim 1 describes may be briefly stated as a device for separating the synchronizing pulses from the composite video signal and transmitting them without the unwanted electrical impulses if such unwanted electrical impulses are above the level of the synchronizing pulses. To do this, the synchronizing-signal separator is momentarily made inoperative in response to the occurrence of the unwanted electrical signals.

## THE DEFENSE THAT RICHMAN 558 IS INVALID AS ANTICIPATED BY TOLSON 084.

Tolson 084, dated February 18, 1941, is an invention the objects of which are

to provide an improved method of and means of separating picture and synchronizing signals; to provide for supplying synchronizing pulses of substantially constant amplitude; and to provide for an improved method of and means for separating horizontal and vertical synchronizing pulses.

To achieve these objects, it uses a cathode ray tube in which the amount of the deflection of the electron beam in the tube is used to strike different contacts, depending upon the amount of the deflection of the electron beam. If the electron beam is deflected too far, it misses one of the contacts, and no signal is delivered.

It operates on a dynamically varying bias, but the bias on which it operates is admitted by the defendant to be the same kind of bias which occurs in the accused circuit, that is to say, it varies with the picture content. Although the Tolson device may be adjusted so that unwanted electrical impulses occurring at the time of the sync pulses may cause the cathode ray beam to deflect off of its contact plates, it contains nothing to render the synchronizing-signal separator inoperative.

Richman 558 has a different dynamically varying bias from a different source: the line scanning amplifier. The bias in Richman 558 is representative of and varies dynamically with the amplitude of the synchronizing pulses, while the dynamically varying bias in Tolson 084 varies with picture content. While an incidental effect of Tolson 084 may be improved noise cancellation, if it is adjusted so that the cathode ray beam deflects off its contact plates in response to noise signals, the sync signal separator device is never rendered inoperative as it is in Richman 558 in response to the unwanted electrical or noise signals.

It is the opinion of the court that Tolson 084 does not anticipate Richman 558 under 35 U.S.C. § 102(a) and (b). Its dynamically varying bias, while it may be similar to that of the accused circuit, is entirely different to that of Richman

558; it includes no claim comparable to clause D, Claim 1, of Richman 558; and, indeed, one of its stated objects is to provide *"synchronizing impulses of substantially constant amplitude."* Ex. D307, p. 1, col. 1, while Richman 558 delivers a relatively noise free sync signal *"regardless of the variation in amplitude of said synchronizing pulses."* Ex. P27, col. 11.

Remarks later in this opinion as to Tolson 084 should be read in conjunction with those made just above.

THE DEFENSE THAT RICHMAN 558 IS INVALID UNDER 35 USC § 103 FOR OBVIOUSNESS OVER WHAT WAS SET FORTH IN LAMB 549, FARRINGTON 470, MARTINELLI 333, APPLEGARTH 140, AND TOLSON 084.

As to Farrington 470. Farrington 470, dated March 28, 1939, relates to a wave signaling system for a radio receiver, including provisions for reducing the effect of transient electrical disturbances. It does interrupt a circuit for the duration of unwanted noise signals in a radio receiver.

The uncontradicted evidence, however, is that Farrington 470 operates from a fixed rather than a variable threshold bias. The band width in which Farrington 470 operates is 5000 cycles, while television receivers operate in a band width some 600 times as wide. *None of the claim elements of Richman 558 are disclosed in Farrington 470,* and nothing either in the patent or the record shows that its use was ever contemplated as a noise canceling device for use with a synchronizing signal separator in a television set.

For these reasons, the court is of opinion that Richman 558 is not obvious under 35 U.S.C. § 103 in view of Farrington 470.

As to Tolson 084. Tolson 084 has been discussed as it relates to the defense of anticipation under 35 U.S.C. § 102(a)

and (b), and the remarks made earlier in this opinion, as applicable, should be considered here. The Tolson 084 circuit is a synchronizing signal separator circuit for developing synchronizing pulses of constant amplitude. Richman 558 does not attempt to provide sync signal pulses of constant amplitude, but rather concerns itself with separating and delivering the sync pulses above the maximum level of picture signaling components *regardless of variations of amplitude of said synchronizing pulses.* Claim 1 of Richman 558. The dynamically varying bias of Tolson 084 varies with the picture content, not with the sync signals as in Richman 558. The source of the dynamically varying bias in Richman 558 is the line scanning amplifier, which is not so in Tolson 084. Tolson 084 fails to disclose that which is disclosed in the preamble and in clause D of Claim 1 of Richman 558.

For these reasons, which should be read in conjunction with the previous remarks made about Tolson 084 in this opinion, the court is of opinion that the Richman 558 is not obvious under 35 U.S.C. § 103 in view of Tolson 084.

Concerning Lamb 549, Martinelli 333, and Applegarth 140. In the case of In re Richman, 424 F.2d 1388 (C.C.P.A. 1970), decided while this case was pending, Lamb 549, Martinelli 333, and Applegarth 140 are considered in detail as they relate to a previous prior art rejection. A part of the opinion in that case is here copied. It is fully supported by the record in this case, and the court adopts it as its own. Reference in the opinion to Holland 929, Marconi 970, and Television, Zworykin & Morton, in the quoted part of the opinion, do not detract from it but rather serve to explain the reasoning of that court, and such extraneous references have not been deleted from this opinion for that reason. In addition, the C.C.P.A. rejection of Claim 3 of Richman 558, as contrasted to Claim 1 thereof, serves to illuminate and underscore the validity of Claim 1.

*"The Prior Art*

"The references involved in the prior art rejection are:

| | | | |
|---|---|---|---|
| Lamb | 2,101,549 | Dec. 7, | 1937 |
| Martinelli | 2,299,333 | Oct. 20, | 1942 |
| Applegarth | 2,356,140 | Aug. 22, | 1944 |
| Holland et al | 2,434,929 | Jan. 27, | 1948 |
| Marconi | 145,870 | Mar. 25, | 1952 |
| (Australian) | | | |

'Television' by Zworykin and Morton, John Riley, 1940 (pages 464–465)

"Martinelli relates to a system for reducing the effect on the scanning circuits of a television receiver of noise signals present in a composite video signal having negative picture signal modulation. The composite signal is applied to a synchronizing-signal amplifier which feeds the synchronizing-signal separator. This composite signal is concurrently applied to the input circuit of a noise inverter tube. That tube provides amplified noise-pulses in inverted form at its output, which pulses are applied to the suppressor grid of the amplifier tube to block it for the duration of the noise pulses and prevent transmission of those pulses to the synchronizing-signal separator. The inverter tube is disclosed as having a bias means manually adjustable to selected values. The specific circuit of the separator tube, and hence its biasing means, are not disclosed.

"The Lamb patent relates to a radio receiver provided with means to silence undesired noise impulses which exceed in strength the voltages induced by desired signals. The input signal from the antenna is fed through an amplifier to the detector and thence to the audio frequency amplifier and loud speaker. The signal is also applied to a silencer tube which becomes conductive in response to the presence in the input of an undesired pulse exceeding a selected value. The silencer tube then produces a control voltage which is applied to the tube of the amplifier to either disable that tube or reduce its amplification for the duration of the undesired pulse. In one form, the silencer tube is provided with a nega-

tive bias which determines the amplitude of noise to which it responds by a manually adjusted biasing means. In a modification, the negative bias is provided through an AVC (automatic volume control) circuit so that the conductive level or threshold of the tube varies dynamically with the volume of the signals received.

" 'Television' describes several types of synchronizing-signal separator circuits for television receivers. In one circuit, the grid of the separator tube is self-biased to cut-off by rectification of the applied signal in the grid circuit, which circuit includes a time-constant circuit consisting of a series condenser and a shunt ' resistor. The reference states:

> * * * the grid tends to maintain itself at such a d-c potential that zero bias corresponds to the maximum positive peaks of the signal, or in this case, the top of the synchronizing impulses. If the amplitude of the impulses is sufficient so that black corresponds to plate current cutoff, only the synchronizing impulses are amplified, the rest of the signal occurring beyond cutoff.

"Applegarth relates to a television receiver having a combined AGC and synchronizing-signal separator circuit. The AGC circuit comprises a triode fed with the composite intermediate frequency signal to develop the AGC voltage at its anode. That tube also has a time-constant circuit in its cathode circuit which develops a bias varying with signal strength. The intermediate frequency signal is also fed to the separator tube which has its grid biased with a portion of the varying bias voltage in the cathode circuit of the AGC tube to clip the synchronizing pulses at a selected level above the picture signal despite variations in strength of the input signal. The output signals from the separator are fed to the scanning or deflecting generator through a diode so biased as to clip or limit the amplitude of any high amplitude noise pulses passed by the separator to a value substantially equal to that of the synchronizing pulses.

"In the view we take of the case, specific consideration of the Holland and Australian Marconi patent becomes unnecessary.

"The examiner rejected the claims as unpatentable over Martinelli taken with Lamb, further referring to the 'Television' publication, and was sustained in that position by the board. Such rejection, characterized by the solicitor in oral argument as the best prior art rejection, is plainly based on obviousness under 35 U.S.C. § 103.

"The examiner recognized that Martinelli's noise-cancelling circuit operating on the synchronizing-signal amplifier has a fixed threshold. However, the rationale of the rejection is that the showing in Lamb of the alternative use of an automatic volume or gain control signal to provide a dynamic bias, in place of a fixed bias, in a noise-cancelling circuit in a radio receiver would suggest to one skilled in the art the substitution in Martinelli's noise-suppressor circuit of means for providing a dynamic bias varying with the synchronizing signal strength. The rejection is further based on the proposition that it would also be obvious to use a self-biasing synchronization-signal separator as shown in 'television' as the separator in Martinelli.

"Turning to the merits of this rejection, it is true that Martinelli does not specifically show or describe an automatic gain control circuit to provide signals in the receiver which are automatically compensated for variations in the strength of the received signal. However, Martinelli does discuss the alternatives of providing the tubes in the early stages of the receiver with filter circuits which have either a very short or a very long time constant and states, with respect to the use of the latter alternative:

> This, however, cannot be done where an automatic volume control voltage is being applied to the tube.

That statement plainly suggests that, when filter circuits of suitable time constants are employed, automatic volume or gain control (AGC) could be employed in Martinelli. Moreover, the record pro-

vides no basis for doubting that a person having ordinary skill in the art would have been able to provide such a control in carrying out that suggestion.

"Lamb's teaching of the substitution of means automatically regulating the threshold silencing point of a noise-cancelling circuit by using a bias varying dynamically with the automatic volume or gain control voltage as an alternative to providing a non-dynamic, but manually adjustable, bias suggests that the noise-suppressor circuit in Martinelli might also be automatically biased. While appellant urges that substitution of the Lamb circuit in Martinelli would result in an inoperative device, that is not material here. The question in a rejection for obviousness on a combination of references is what the secondary reference would teach one skilled in the art and not whether its structure could be bodily substituted in the basic reference structure. In re Soderquist, 51 C.C.P.A. 969, 326 F.2d 1016, 140 USPQ 387, (1964). What Lamb teaches is the concept of automatically varying the bias of a noise-suppressor tube in accordance with variations in strength of the applied signals instead of using a bias which is manually adjusted in accordance with what the strength of the signals is expected to be. We think the utility of incorporating such an *automatic or dynamic* bias in Martinelli would have been apparent to a person having ordinary skill in the electronic communications art, and we find nothing in the record that gives rise to any doubt that it would have been within the ability of such a person to follow through to produce an operative circuit incorporating that concept.

"As to the synchronizing-signal separator, Martinelli suggests use of a circuit 'of any well-known type.' This clearly suggests employing separator circuits that become known subsequent to his application as well as those already known. Certainly that suggestion applies to circuits in 'Television,' which is a textbook published only shortly after Martinelli's application was filed. For that reason, and in light of the reference

in 'Television' to its self-biased separator as '[a] more satisfactory limiter [separator]' than a fixed-bias separator previously described therein, we are satisfied that it would have been obvious to employ the 'Television' self-biased separator in Martinelli.

"We think that the Martinelli circuit so modified in an obvious manner in accordance with the Lamb and 'Television' references demonstrates that Claims 3, 11, and 12 are unpatenable. None of these claims requires that the synchronizing-signal separator be connected to the same dynamically-varying bias voltage as the noise-suppressor [6] and appel-

6. Claim 3 recites 'a synchronizing-signal stripper responsive to at least some of * * * [the] components of * * * [the composite] video frequency signal and undesirably responsive to * * * [the] noise pulses * * *,' but does not specify how it is biased.

lant has not pointed out any limitation by which they distinguish from such modified circuit.

"Claims 1 and 2 present an additional issue, however. Thus, they require that the synchronizing-signal separating means be dynamically responsive to 'a potential' which is developed in the 'second means' and is 'representative of' and 'varies dynamically with' the amplitude of the synchronizing pulses. That 'second means' is coupled to the 'means * * * for rendering * * * [the] separating means inoperative in response to the occurrence of * * * noise signals' (the noise suppressor). Martinelli as modified in accordance with Lamb and 'Television' would not comply with those requirements. Rather, the separator would then be biased from its own input circuit and thus not be dynamically responsive to the 'potential' provided by the second means, which means is coupled to the noise suppressor.

"Moreover, we find nothing in the record to demonstrate that it would be obvious to make such further changes in Martinelli as would be necessary to meet Claim 1. In particular, we do not see that Applegarth, which we next discuss in some detail, would have suggested any

modification of Martinelli's noise-cancelling circuit that would result in the noise suppressor and signal separator being supplied from the same dynamic-bias source. We accordingly will not sustain the rejection of Claims 1 and 2 on grounds involving Martinelli as the basic reference.

"The board also held the claims unpatentable over Applegarth, possibly as anticipated thereby (35 U.S.C. § 102) but certainly as obvious in view of it and other references including Martinelli (35 U.S.C. § 102). In so relying on Applegarth, the board was in effect reviving a rejection on that patent which the examiner originally made but withdrew in his Answer. We conclude that the rejection based on Applegarth must be reversed.

"The Applegarth television receiver derives an AGC voltage from the output of the intermediate frequency amplifier circuit and applies it to control the gain of that circuit. It also imposes a portion of a signal varying with the AGC voltage at suitable polarity to a synchronizing-signal separator tube. The output of the latter tube is connected to the utilization circuit for the synchronizing signals through a diode biased to clip the tops off noise signals passed by the separator that exceed the amplitude of the synchronizing signals. Since Applegarth merely clips the noise signals from the separator, it does not anticipate the claims, which require that the separator be disabled or rendered inoperative.

"The only secondary reference which requires discussion in connection with the rejection involving Applegarth as a basic reference is Martinelli. The board regarded the latter as demonstrating that it would be obvious to connect a diode or triode across the separator tube of Applegarth 'to render it inoperative in the presence of noise.' However, it is not apparent that one skilled in the art would have found it obvious to add a circuit to suppress noise to a receiver already equipped to reduce the effect of noise by clipping the noise pulses. Even if Martinelli were held to suggest substitution of its noise-cancelling circuit in

Applegarth, we do not see that it would have been obvious to employ that circuit in any manner which resulted in its being supplied with a dynamic bias from the Applegarth separator tube circuit. Accordingly, the rejection grounded on Applegarth as a basic reference is reversed." 424 F.2d 1388, 1393–1396.

As above set forth, it is clear that none of the patents relied on for obviousness by the defendant has suggested a dynamically varying bias representative of and which varies dynamically with the amplitude of the synchronizing pulses. None of them, nor do they together, suggest that such dynamically varying bias (which in Richman 558 uniquely comes from the line scanning amplifier) must be applied to the sync signal separator and also to the noise interruption circuit. It is, therefore, the opinion of the court that Richman 558 is not obvious under 35 U.S.C. § 103 when viewed in the light of Farrington 470, Tolson 084, Lamb 549, Martinelli 333 and Applegarth 140, either when taken singly or when taken together.

■ Accordingly, it is the opinion of the court that the defense of invalidity, either for anticipation or obviousness, 35 U.S.C. §§ 102, 103, is not well taken.

## LACHES AND ESTOPPEL

The defendant asserts that enforcement against the Philco circuit is barred by laches and estoppel because under Muncie Gear Works v. Outboard Marine and Mfg. Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942), there was in public use or sale devices embodying the asserted invention more than two years before it was first presented to the patent office. It follows up this contention with its continued assertion, previously disposed of in this opinion as to the effective date of the patent, that Richman first asserted the claims here involved in 1955.

All of defendant's brief is pointed to Claim 3, which is now not an issue in this case, and the question can really properly be considered moot.

■ However, assuming for the purposes of argument that defendant is speaking of Claim 1: the filing date of Richman 558 is 1950, and 35 U.S.C. § 120 provides that Richman 558 is entitled to take effect on that date.

■ Rule 118 of the patent office Rules of Practice provide against departures from or additions to the original disclosures, and it is Hornbook law that new matters cannot be introduced by amendment.

■ In any event, all of the devices which Philco claims came into public use or sale prior to 1955, as a matter of fact, are not devices "embodying the asserted invention," so that, assuming that 35 U.S.C. § 120 is not to be given any effect and that the patent office rule had been violated, the defendant still does not put itself within the rule of *Muncie Gear Works* because the devices claimed by Philco as embodying the asserted invention do not, in fact, embody it.

It is the opinion of the court that the defenses of laches and estoppel are not well taken.

THE DEFENSE THAT CLAIM 1 OF RICHMAN 558 IS INVALID UNDER 35 U.S.C. § 112 FOR FAILING TO DISTINCTLY CLAIM THE INVENTION, PARTICULARLY WITH RESPECT TO THE MEANS FOR DEVELOPING A POTENTIAL REPRESENTATIVE OF THE AMPLITUDE OF THE SYNCHRONIZING PULSES.

■ The defendant insists that it does not understand what the phrase "the amplitude of said synchronizing pulses" means. The plaintiff characterizes this as an exercise in semantics, with which conclusion the court agrees. The quoted language is from clause B of Claim 1 of Richman 558 and most obviously refers to the potential developed in the second means. As previously has been discussed, this potential which is referred to in clause B of Claim 1 is then used to bias the sync signal separator tube and the noise interruption circuit. Citation of authority in this regard is useless. The explanation in the patent,

Ex. P–27, is quite clear. The court is of opinion that this defense is wholly without any merit whatsoever.

THE DEFENSE THAT RICHMAN 558 DOES NOT ENJOY A PRESUMPTION OF VALIDITY

■ In this defense, the defendant again contends, for all practical purposes, that the issue date of 1950 is not justified. Its contention is that in the prosecution of the original Richman 558 application the plaintiff, by prosecuting one species of the invention, gained a delay in the prosecution of the other species, which is the claim now at issue. The defendant then claims that the plaintiff avoided bringing to the attention of the patent office Farrington 470, Lamb 549, Martinelli 333, and the Philco TV 90 or 390 receiver.

The Philco 390 and TV 90 receivers were first put on the market in 1955 and 1952, years after the filing of the Richman 558 application on July 21, 1950.

Firestone points to no evidence which indicates that the choice of which species of invention to prosecute was proceeded with for the purpose of delay. As plaintiff points out in its brief, had it been aware of the Philco circuits as early as 1952, and had it considered such circuits to infringe, it would have been to plaintiff's advantage to proceed with the species of invention which would have caused the issuance of Claim 1 of the 558 patent as soon as possible.

Since none of the patents relied on by defendant teach the invention of Richman 558, not calling them to the attention of the patent office in no way affects the presumption of validity of Richman 558. Since the Philco circuits involved came later than the filing of Richman 558, they likewise do not affect the presumption of validity. There was no occasion to call any of them to the attention of the examiner.

Defendant's reliance on Technograph Printed Circuits, Ltd. v. Bendix Aviation Corp., 218 F.Supp. 1 (D.Md.1963), and the Fourth Circuit cases therein cited is misplaced. The facts of this case do not warrant a weakening of the presumption.

In *Technograph*, the court applied the principle that the presumption of validity of a patent is weakened by failure to cite [*by the Patent Office*] a number of patents to be discussed. The opinion of the C.C.P.A. in this case shows that the examiner did consider Martinelli, Lamb, and Applegarth, here relied upon by the defendant as well as *Television*, not here so relied upon. The record shows that the examiner did search the classes and subclasses in which *all five patents* relied on by the defendant were included. Presumably the examiner did his duty, considered them, and while citing Martinelli, Lamb, and Applegarth, did not consider Tolson and Farrington worthy of note.

In the opinion of the court, Richman 558 enjoys a presumption of validity under 35 U.S.C. § 282.

THE DEFENSE THAT CLAIM 1 OF RICHMAN 558 IS INVALID BECAUSE IT IS CLAIMED THAT IT DOES NOT DIFFER MATERIALLY FROM RICHMAN CLAIM 3, THE PLAINTIFF HAVING ACQUIESCED IN THE OPINION OF THE COURT OF CUSTOMS AND PATENT APPEALS THAT CLAIM 3 IS INVALID

This defense was, in fact, first asserted after the report of the Special Master. Although the defendant takes the position it was raised in its brief, a careful reading of the brief does not so disclose this contention. It could not have been in its stated form, for the acquiescence in the report of the Court of Customs and Patent Appeals did not take place until after the report of the Special Master and much later than the filing of the defendant's brief.

The position of the defendant in this is that there is no significance to the fact that Claim 1 of Richman 558 requires that the dynamically varying bias be connected to both the sychronizing signal separating means and the noise interruption circuit.

The court does not agree with this contention. Emphasis was laid on this point in the opinion of the Court of Customs and Patent Appeals, and this court

agrees with the conclusions there drawn. The fact that Claim 1 requires the bias developed by the second means to be applied both to the sync signal separator and to the noise suppression circuit is of considerable consequence. Also of considerable consequence is the fact that Claim 3 of Richman 558 does not require the synchronizing signal separator to be connected to any source of dynamically varying bias.

The foregoing are apparent from the face of the claims involved, and are basic differences in Claims 1 and 3 of Richman 558.

The court is of opinion that the defense that Claims 1 and 3 do not differ materially is not well taken.

THE DEFENSE THAT THE RICHMAN 558 PATENT IS NOT INFRINGED

■ The defendant asserts that the accused circuit follows teachings of the prior art, not Richman 558; that Claim 1 of Richman 558 does not read on the accused circuit; and that the doctrine of equivalents does not bring the accused circuit within the scope of the claim of Richman 558.

An analysis of this defense by comparing Claim 1 of Richman 558 to the two circuits follows:

"Claim 1

*Preamble: A highly noise-immune synchronizing-signal separator system for a television receiver comprising:*"

The evidence undisputedly supports the contention that both the Richman 558 and the accused circuit fit into the definition of the preamble of the claim. The parties so concede.

"[*A*] *first means for supplying a negatively modulated television signal including picture-signal components and synchronizing pulses which tend to be accompanied by unwanted noise signals greater in amplitude than the synchronizing pulses;*"

This element is the video frequency amplifier in both circuits, and there is no dispute that this part of the claim reads on both circuits.

"[B] *second means coupled to said first means for developing a potential representative of and which varies dynamically with the amplitude of said synchronizing pulses.*"

In the Richman 558 circuit, this is triode tube 30 (together with its allied resistors and capacitors 33, 34, 35, 39, 60 and external B+) which gets its control pulse source from the line scanning amplifier and develops its bias as a result of the pulses applied to the anode of tube 30, which bias is developed in the cathode tube circuit across the network 32. This bias is representative of and varies dynamically with the amplitude of the synchronizing pulses.

The accused circuit has no second means as such. The bias applied to the grid of tube 1/2S8 is grid leak self bias. Such bias is not representative of and does not vary dynamically with the amplitude of the synchronizing pulses. The bias rather varies with the composite video signal, which means it varies both with the picture content and with the synchronizing signals. It is biased from its own input circuit, and it is not dynamically responsive to and representative of the potential provided by the second means in Claim 1 of Richman 558.

At this point, the court notes that there is a considerable variance in the contentions of the parties in argument, briefs and the testimony concerning the dynamically varying bias. The plaintiff now claims that in Richman 558 it is primarily representative of and varies dynamically with the amplitude of the synchronizing pulses and secondarily varies with the picture content. The plaintiff further asserts that the dynamically varying bias in the accused circuit is constituted in the same manner.

The defendant now asserts that such bias in Richman 558 is representative of and varies dynamically with the amplitude of the synchronizing pulses only and that such bias in the accused circuit varies with the picture content.

Various testimony, admissions, references, and assertions are put forth by both sides to support their respective positions. The plain language of Richman 558, P–27, makes it quite clear that the amplitude of the dynamically varying bias in Richman 558, and, in fact, a distinguishing characteristic of that circuit is that "specifically the developed potential is proportional to the amplitude of those components [the synchronizing pulses]. * * *" P–27, column 7, line 45. This language of the patent explaining its operation supports the language of clause B of Claim 1 of Richman 558. It is also supported by other evidence in the record. It is acknowledged by both sides that the dynamically varying bias of the accused circuit does vary both with the synchronizing pulses and with the picture signal. Try as the defendant may, it cannot get away from this. The best case which can be made for the plaintiff is that the dynamically varying bias in the accused circuit varies in the ratio of 2½ to 1 with the amplitude of the synchronizing signals and in the ratio of 30% with the picture content.

The Special Master not having addressed himself to this specific point, the court finds as a fact that the dynamically varying bias of Richman 558 is representative of and varies dynamically with the amplitude of the synchronizing pulses. The court further finds as a fact that the dynamically varying bias of the accused circuit varies principally with the amplitude of the synchronizing pulses but also with the picture content of the signal, and that a variance of 2½ to 1 for the synchronizing pulses and 30% for the picture signal is not atypical.

In view of the foregoing, the court is of opinion that the dynamically varying bias of the accused circuit comes from a different source than such bias of Richman 558, is of a different magnitude than the dynamically varying bias of Richman 558, and varies dynamically both with the picture signal and with the synchronizing pulses, rather than with amplitude of the synchronizing pulses as in Richman 558.

The court is therefore of opinion that clause B of Claim 1 of Richman 558 does not read on the accused circuit and is also of opinion that the accused circuit

does not operate within clause B of Claim 1 of Richman 558.

"[C] *synchronizing-signal separating means responsive to said first means and dynamically responsive to said potential for separating said synchronizing pulses above the maximum level of said picture-signal components regardless of variations in the amplitude of said synchronizing pulses;*"

Both circuits do have synchronizing-signal separating means responsive to said first means. These are triode tube 50 in Richman 558 and triode 1/2S8 in the accused circuit. Both synchronizing-signal separating means are also dynamically responsive to a dynamically varying bias. Both circuits do separate the synchronizing pulses above the maximum level of the picture signal regardless of variations in the amplitude of said synchronizing pulses. There is no serious dispute about this, and the court is of opinion that clause C of Claim 1 reads on the accused circuit. But even here the sync signal separating means in the accused circuit is responsive to a different dynamically varying bias than said bias potential of Richman 558.

"[D] *and means coupled to said first and second means for rendering said separating means inoperative in response to the occurrence of said noise signals.*"

Both circuits do have a noise interruption circuit between the video frequency amplifier and the synchronizing signal separator. Richman 558 uses a diode to compare the dynamically varying bias with the unwanted electrical signals. It is normally biased non-conductive. When it does conduct in response to a noise signal of sufficient magnitude, it transmits electrical impulses to the cathode of the synchronizing signal separator to render it inoperative. The accused circuit uses triode 1/2S7 to perform almost exactly the same function as diode 90 performs in the Richman 558 circuit. Triode 1/2S7 is ordinarily biased to be non-conductive. It compares the dynamically varying bi-

as with the unwanted electrical signals, and when it becomes conductive in response to a noise signal of sufficient magnitude, transmits an electrical impulse to the grid of the synchronizing signal separator, thus rendering it inoperative. The court considers the noise interruption circuits of the two circuits involved to be essentially the same and a distinction without a difference. The court is of opinion that clause D of Richman 558 reads on the accused circuit.

To summarize. The court finds that the accused circuit does not infringe Claim 1 of Richman 558. Clause B of Claim 1 does not read on the accused circuit. While a dynamically varying bias is applied in both circuits to bias the synchronizing-signal separator and the noise interruption circuit, it is not the same dynamically varying bias. In Richman 558, said bias is representative of and varies dynamically with the amplitude of the synchronizing pulses. In the accused circuit, said bias varies dynamically with the amplitude of the synchronizing pulses and also with the picture content. The bias in Richman 558 is developed from a different source by a different means than the grid leak self bias of the accused circuit.

For the foregoing reasons, the court is of opinion that the defense that the accused circuit does not infringe Richman 558 is well taken.

### ATTORNEYS' FEES

The Court is of opinion that this is not an exceptional case and attorneys' fees will not be awarded. 35 U.S.C. § 285. American Chain and Cable Company v. Rochester Ropes, Inc., 199 F.2d 325 (4th Cir. 1952); Berry Bros. v. Sigmon, 317 F.2d 700 (4th Cir. 1963); Carolina Lee Knitting Company v. Johnson and Johnson, 275 F.2d 91 (4th Cir. 1960). Compare Colgate-Palmolive Company v. Carter Products, Inc., 230 F.2d 855 (4th Cir. 1956), and Tidewater Patent Development Company v. Kitchen, 371 F.2d 1004 (4th Cir. 1966).

An order is this day entered consistent with this opinion.

APPENDIX